## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
## SOUTHERN DIVISION

**JACOB BLAIR SCOTT**                                    **PLAINTIFF**

**VERSUS**                    **CIVIL ACTION NO. 1:21-cv-00189-HSO-BWR**

**VITAL CORE STRATEGIES, et al.**                    **DEFENDANTS**

### REPORT AND RECOMMENDATION

Proceeding under 42 U.S.C. § 1983, *pro se* Plaintiff Jacob Blair Scott filed this lawsuit on June 2, 2021, and his allegations were clarified at an Omnibus Hearing on January 11, 2022.[1] *See* Compl. [1]. When he filed his Complaint, Plaintiff was a pretrial detainee housed at the Jackson County Adult Detention Center ("JCADC") in Pascagoula, Mississippi.[2] *Id*. at 2, 6. He named as Defendants Sheriff Mike Ezell, Captain Tyrone Nelson, Deputy Geneva Drummond, and Deputy John Barnes ("the County Defendants"); Vital Core Strategies, Amanda Harris, and Angie Hand ("the Vital Core Defendants"); and CT Corporation Systems. *See* Am. Compl. [7]; (Text-Only Order June 29, 2022); Order [51]. Plaintiff is not proceeding *in forma pauperis*.

Before the Court are four motions: (1) the Motion [107] for Summary Judgment filed by the County Defendants, (2) the Motion [112] for Summary Judgment filed by the Vital Core Defendants, (3) the Motion [130] to Dismiss CT Corporation Systems

---

[1] *See Spears v. McCotter*, 766 F.2d 179, 181-82 (5th Cir. 1985) (authorizing the magistrate judge to "hold an evidentiary hearing" to allow a *pro se* plaintiff to provide a "more definite statement"), *abrogated on other grounds by Neitzke v. Williams*, 490 U.S. 319, 324 n.3 (1989).

[2] Plaintiff has since been convicted of multiple offenses, including sexual battery and unlawful touching of a child, and is serving an 85-year sentence in the custody of the Mississippi Department of Corrections. *See* Jacob Scott, https://www.ms.gov/mdoc/inmate/Search/GetDetails/238964 (last accessed July 12, 2023).

filed by Plaintiff and (4) the Motion [131] for Reconsideration of the Court's latest discovery order filed by Plaintiff. Plaintiff has responded to both Motions for Summary Judgment, and Defendants have replied. Resp. [115] [120]; Reb. [119] [124].[3]

For the following reasons, the undersigned recommends that the Motion [107] for Summary Judgment filed by the County Defendants be granted, the Motion [112] for Summary Judgment filed by the Vital Core Defendants be granted, the Motion [130] to Dismiss CT Corporation Systems filed by Plaintiff be granted, and the Motion [131] for Reconsideration filed by Plaintiff be denied. Accordingly, the undersigned recommends that Plaintiff's claims against Sheriff Ezell, Captain Nelson, Deputy Drummond, and Deputy Barnes be dismissed with prejudice. The undersigned recommends that Plaintiff's federal claims against Vital Core Strategies, Harris, and Hand be dismissed with prejudice, and his state-law claims against these Defendants be dismissed without prejudice. The undersigned recommends that Plaintiff's claims against CT Corporation Systems be dismissed without prejudice. Recommending dismissal of all claims against all Defendants, the undersigned finally recommends that this case be closed.

## I. BACKGROUND

As summarized below, Plaintiff's allegations are drawn from the Amended

---

[3] Plaintiff has also filed two unauthorized sur-replies [122] [127], which the undersigned considered in this analysis. *See Washington v. Jackson State Univ.*, 532 F. Supp. 2d 804, 809 (S.D. Miss. 2006) ("A liberal reading of plaintiff's pleadings is the only special treatment afforded *pro se* plaintiffs by the courts.").

Complaint [7] and his testimony at the omnibus hearing.  Plaintiff broadly advances four categories of claims, with additional allegations against Defendants Ezell and Nelson.  These four categories include: (1) denial of medical care; (2) denial of privacy; (3) JCADC's use of dirty hair clippers; and (4) overuse and misuse of lighting.  These allegations span from March 2020 through March 2021.  *See* Am. Compl. [7].  Defendants' evidence relevant to each allegation is discussed as appropriate in the analysis. *See infra* Section III.

*First*, Plaintiff alleges that the Vital Core Defendants were deliberately indifferent to his serious medical needs during his stay at JCADC.  Plaintiff says that he was diagnosed with ulcerative colitis in 2017.  (Tr. 39).  Despite knowing about his diagnosis, the Vital Core Defendants allegedly refused to provide him with appropriate testing and treatment.  Am. Compl. [7] at 7, 9, 12; (Tr. 11-13, 16-22, 39-40).  Plaintiff also alleges that Deputy Drummond refused to provide him with additional toilet paper, which he needed as a result of his ulcerative colitis.  (Tr. 22, 30-31, 45).

Also, Plaintiff avers that he slipped and fell at JCADC, which aggravated a pre-existing knee injury.  Am. Compl. [7] at 14; (Tr. 14).  Despite his inability to walk, the Vital Core Defendants refused to provide appropriate treatment for the injured joint.  Am. Compl. [7] at 9, 14.  Finally, Plaintiff believes that he contracted COVID-19 because the Vital Core Defendants and other JCADC personnel refused to provide him with a face mask.  Am. Compl. [7] at 24; (Tr. 33).  He once experienced flu-like

symptoms that he attributes to COVID-19, though he apparently never received a positive test result.  (Tr. 33-34).

*Second*, Plaintiff claims that he suffered several violations stemming from a lack of privacy at JCADC.  He was strip searched in front of others.  Am. Compl. [7] at 9, 21; (Tr. 30).  Because JCADC's visitation rooms were closed during the COVID-19 pandemic, he was allegedly forced to have confidential conversations with his attorneys on the recorded telephone lines.  (Tr. 34-35); *see also* (Tr. 41).  He was forced to answer medical-screening questions in front of other people.  Am. Compl. [7] at 7; (Tr. 17).  And he believes that his legal mail was opened and read outside his presence.  Am. Compl. [7] at 9, 18-19; (Tr. 30).  Plaintiff blames Defendant Barnes for the mail allegations, including that he never received some of his legal mail.  (Tr. 31).

*Third*, Plaintiff complains that prison staff used dirty hair clippers on inmates.  (Tr. 25).  Because the clippers are not sterilized between haircuts, Plaintiff believes that he contracted folliculitis.  (Tr. 25-26).  He was prescribed a steroid cream, which cleared the rash, but he avers that the treatment was delayed by many months.  (Tr. 26).  Plaintiff alleges that the practice of using dirty hair clippers is ongoing, despite him asking "Deputy Pinter" to clean them.  (Tr. 48).

*Fourth*, Plaintiff complains that the lighting at JCADC has also created an unconstitutional condition of confinement.  Allegedly, the lights were left on for a period of many months before being manually shut off.  Am. Compl. [7] at 23; (Tr. 32).  Once they were manually shut off, Plaintiff avers that the lights remained off for a

period of three weeks. Am. Compl. [7] at 27.

*Finally*, Plaintiff sued Ezell and Nelson in their official and individual capacities as the gatekeepers of these allegations. (Tr. 29-30). Plaintiff says that he notified Ezell of his medical needs—to no avail. (Tr. 29-30). Plaintiff says that he also notified Nelson of his medical needs, along with the other allegations raised in his Amended Complaint, and nothing was done to remedy these problems. (Tr. 29-30). When questioned at the Omnibus Hearing, Plaintiff advised the Court that he is suing CT Corporation Systems because he "was told that [it] was a parent company or possibl[e] insurer of Vital Core." (Tr. 37).

## II. STANDARD OF REVIEW

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). "A dispute is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Westfall v. Luna*, 903 F.3d 534, 546 (5th Cir. 2018) (quotation omitted). "An issue is material if its resolution could affect the outcome of the action." *Sierra Club, Inc. v. Sandy Creek Energy Assocs., L.P.*, 627 F.3d 134, 138 (5th Cir. 2010) (quotation omitted). "On a motion for summary judgment, the court must view the facts in the light most favorable to the non-moving party and draw all reasonable inferences in its favor." *E.E.O.C. v. WC&M Enters., Inc.*, 496 F.3d 393, 397 (5th Cir. 2007).

"Summary judgment is proper if the movant demonstrates that there is an

absence of genuine issues of material fact." *Topalian v. Ehrman*, 954 F.2d 1125, 1131 (5th Cir. 1992).  "The movant accomplishes this by informing the court of the basis for its motion, and by identifying portions of the record which highlight the absence of genuine factual issues." *Id.*  "Rule 56 contemplates a shifting burden: the nonmovant is under no obligation to respond unless the movant discharges its initial burden of demonstrating entitlement to summary judgment." *Mack v. Waffle House, Inc.*, No. 1:06-cv-00559-RHW, 2007 WL 1153116, at *1 (S.D. Miss. Apr. 18, 2007) (quotation and brackets omitted).  "[O]nce a properly supported motion for summary judgment is presented, the nonmoving party must rebut with 'significant probative' evidence." *Id.* (quoting *Ferguson v. Nat'l Broad. Co., Inc.*, 584 F.2d 111, 114 (5th Cir. 1978)).

### III. DISCUSSION

Plaintiff has failed to demonstrate a violation of his constitutional rights or that the named Defendants are responsible for causing any such violation.  Thus, the undersigned recommends that both outstanding Motions [107] [112] for Summary Judgment be granted.  Plaintiff's claims against Sheriff Ezell, Captain Nelson, Deputy Drummond, and Deputy Barnes should be dismissed with prejudice. Plaintiff's federal claims against Vital Core Strategies, Harris, and Hand should be dismissed with prejudice, and his claims against these Defendants arising under state law should be dismissed without prejudice.  The undersigned also recommends that Plaintiff's Motion [130] to Dismiss CT Corporation Systems be granted and that

his claims against CT Corporation Systems be dismissed without prejudice.  Finally, the undersigned recommends that Plaintiff's Motion [131] for Reconsideration be denied.  All Defendants having been dismissed and all outstanding issues being resolved, the undersigned recommends that this case be closed.

Because the lion's share of Plaintiff's claims concerns the alleged denial of adequate healthcare, the undersigned will address the Vital Core Defendants' Motion [112] first.

### A. The Vital Core Defendants' Motion [112] for Summary Judgment

Plaintiff's allegations against the Vital Core Defendants concern the alleged denial of medical care for (1) his ulcerative colitis and (2) a pre-existing knee injury that was allegedly aggravated after a fall during his time at JCADC.  Plaintiff's medical records, summarized below, explain the course of events relevant to these two allegations.  The undersigned will then address the constitutional allegations separately, followed by a discussion of Plaintiff's medical-malpractice claims arising under state law.  In the end, the undersigned recommends that all of Plaintiff's medical-care claims be dismissed—the federal claims with prejudice and the state-law claims without prejudice.

### i.    *Relevant Factual Summary of Plaintiff's Medical Care*

On March 7, 2020, Plaintiff submitted a request for certain medications (Mesalamine and Remicade) that were previously used to treat his ulcerative colitis. Mot. [112-1] at 1.  Accordingly, on March 31, 2020, a nurse practitioner ordered a

complete blood count and testing of Plaintiff's stool sample for occult blood.  *Id*. at 24.
Plaintiff's stool sample was collected the same day, *id*. at 25, and his blood test was
performed on April 2, 2020, *id*. at 26.  The laboratory results from Singing River
Hospital reveal that Plaintiff's stool sample was negative for occult blood and that
every metric evaluated as part of his blood test (including hemoglobin and
hematocrit) was within the normal range.  *Id*. at 25-26.  On May 6, 2020, Plaintiff
requested his preferred medication, but was informed that his "bloodwork came back
normal," "there was no blood found in [his] stool," and "the medical provider did not
order any medicine."  *Id*. at 2.

Twenty days later, Plaintiff advised that he "fell down the stairs" and "twisted
[his] knee."  *Id*. at 3.  As a result, he requested ibuprofen and was told that both
ibuprofen and Tylenol were available for purchase from the canteen.  *Id*.  He was also
told that his mother may provide a "knee brace" but that he would "be housed in
booking or isolation" if he chose to wear this "medical device."  *Id*.  Plaintiff submitted
no more requests for treatment related to his knee injury on the jail's kiosk.

On December 9, 2020, Plaintiff advised again that he was suffering
inflammatory symptoms because of his ulcerative colitis.  *Id*. at 6.  On December 17,
2020, a nurse practitioner ordered another complete blood count and more stool-
sample testing.  *Id*. at 28.  Again, Plaintiff's bloodwork returned normal, and the
reviewing physician ordered no additional treatment.  *Id*. at 29. But the doctor noted
at that time that he was "still waiting on [Plaintiff's] stool sample."  *Id*.  Plaintiff

advised medical staff multiple times over the next few weeks that his stool sample was "ready," *id.* at 6, 8, but it was not picked up by the end of 2020. After that point, the kiosk records reflect no further attempts to deliver a stool sample, nor do they reflect any more complaints about ulcerative colitis "up to the date of the omnibus hearing." Mem. [113] at 4.

### ii.    *Treatment for Ulcerative Colitis*

Plaintiff testified at the Omnibus Hearing that he sued Vital Core "because they are the employers of Harris and Hand" and because "they ha[d] been made aware of the situation" through "phone calls and letters" but "ignored it." (Tr. 19). Neither justification holds water.

Plaintiff's first point is easily countered because "Section 1983 does not create supervisory or *respondeat superior* liability." *See Oliver v. Scott*, 276 F.3d 736, 742 (5th Cir. 2002). Vital Core cannot be liable simply because it employs Harris and Hand. *See Watts v. Burke*, No. 5:15-cv-00099-KS-MTP, 2016 WL 1389613, at *2 (S.D. Miss. Apr. 7, 2016) (dismissing claim against corporate prison healthcare provider that employed the doctor allegedly at fault for the plaintiff's injuries).

"Although not subject to vicarious liability for the constitutional torts of its employees, a private corporation such as [VitalCore] may be held liable under § 1983 when an official policy or custom of the corporation causes, or is the moving force behind, the alleged deprivation of federal rights." *Holton v. MTC*, No. 3:17-cv-00485-RHW, 2018 WL 2424427, at *2 (S.D. Miss. May 29, 2018) (collecting cases). But

Plaintiff does not allege, and has not produced evidence of, any policy or custom of Vital Core to ignore requests for medical care from inmates. *See Brown v. Megg*, 857 F.3d 287, 289 (5th Cir. 2017) (affirming dismissal of claims against healthcare provider where the plaintiff did not "identify any . . . policy, practice, or custom of ignoring sick call requests"). Nor has he produced evidence of the "phone calls and letters" allegedly designed to alert Vital Core of his plight. *See* (Tr. 19). Plaintiff argues that Defendants have not produced the relevant policies to be "analyzed," Resp. [121] at 5, but he bears the burden of production under this analysis, *see Scott v. Pyles*, 596 F. Supp. 3d 623, 631 (S.D. Miss. 2022) (requiring the plaintiff to allege an official policy or custom). Without any such evidence, Plaintiff's claims against Vital Core should be dismissed with prejudice.

Likewise, the evidence does not show that the individual Defendant nurses (Harris and Hand) were deliberately indifferent to Plaintiff's ulcerative colitis. Prisoners are not entitled to the best treatment "that money c[an] buy." *Mayweather v. Foti*, 958 F.2d 91, 91 (5th Cir. 1992). "In the context of medical care, a prison official violates the Eighth Amendment when he acts with deliberate indifference to a prisoner's serious medical needs." *Domino v. Tex. Dep't of Criminal Justice*, 239 F.3d 752, 754 (5th Cir. 2001) (citing *Estelle v. Gamble*, 429 U.S. 97, 105-06 (1976)). The Fifth Circuit Court of Appeals describes the relevant inquiry thus:

> Deliberate indifference is an extremely high standard to meet. It is indisputable that an incorrect diagnosis by prison medical personnel does not suffice to state a claim for deliberate indifference. . . . Rather, the plaintiff must show that the officials refused to treat him, ignored

> his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs. . . . Furthermore, the decision whether to provide additional treatment is a classic example of a matter for medical judgment. . . . And, the failure to alleviate a significant risk that the official should have perceived, but did not is insufficient to show deliberate indifference.

*Id.* at 756 (citations, quotations, and alterations omitted). Plaintiff's evidence against Harris and Hand does not satisfy this exacting standard.

Plaintiff says that Harris and Hand violated his constitutional rights by not providing him with treatment for his ulcerative colitis (Tr. 18-19)—specifically Mesalamine and Remicade, which he says were used previously to treat his condition. *See* Mot. [112-1] at 7. But it is undisputed that Harris and Hand are nurses who are not equipped to write prescriptions. Mem. [113] at 7; Reb. [124] at 3; Reb. [127] at 3-4. For that reason alone, Plaintiff has failed to show that Harris and Hand acted with deliberate indifference by not providing him with the medication that he wanted. *See Smith v. Harris*, 401 F. App'x 952, 953 (5th Cir. 2010) ("Because Nurse Slaughter could not write prescriptions, Smith has likewise failed to show that she acted with deliberate indifference by failing to prescribe him pain medication.").

Nor has Plaintiff shown by competent evidence that Harris and Hand refused to dispense medication prescribed by a doctor or a nurse practitioner. He avers that his "medications were stored away in a locker at JCADC and never provided to [him]," Resp. [127] at 4, but unsworn statements like these are insufficient to defeat summary judgment, *see Okoye v. Univ. of Tex. Houston Health Science Ctr.*, 245 F.3d

11

507, 515 (5th Cir. 2001). Instead, the competent summary-judgment evidence shows that Plaintiff endured a battery of tests, and his laboratory results were normal, so his treating physicians at JCADC simply declined to prescribe the medication that he wanted. *See* Mot. [112-1] at 3, 29; *see also Nunley v. Mills*, 217 F. App'x 322, 324 (5th Cir. 2007) (affirming dismissal of claims against prison doctor who refused to prescribe the plaintiff's desired course of treatment).

At worst, Plaintiff alleges that medical personnel refused to collect the second stool sample that he tried to submit in December 2020. Plaintiff twice advised by kiosk report that his stool samples were "ready" for collection, Mot. [112-1] at 6, 8, and they were not retrieved. But those requests were handled by Nurses J. Meyer and A. Reynolds, *id.*—neither of whom are named Defendants in this lawsuit. Instead, Plaintiff testified that Hand refused to collect his stool sample on one occasion while she was running the "med cart" because "the holidays [were] coming up." (Tr. 15). Assuming without deciding that her refusal was constitutionally offensive, one incident of improper medical care does not establish deliberate indifference. *See Dugas v. Quintero*, No. 2:17-cv-00048, 2019 WL 7987920, at *5-6 (S.D. Tex. Oct. 2, 2019) (awarding summary judgment to a prison official who once "refused Plaintiff's request for his medication [because a] one-time denial does not amount to deliberate indifference to Plaintiff's serious medical needs").

In his response, Plaintiff offers the following evidence to show the Vital Core Defendants were deliberately indifferent to his ulcerative colitis. Resp. [121] at 5-7.

A test conducted in 2022 showed a high level of fecal calprotectin in Plaintiff's stool sample, which "indicate[s] . . . ulcerative colitis," among other possible diagnoses. Resp. [120-9] at 5-6. This result contradicts the results obtained from Plaintiff's testing in 2020, which returned normal. Mot. [112-1] at 25-26. Also, the "TeleMedicine Note" of Dr. Renee Shiao, Plaintiff's gastroenterologist, reflects that she examined Plaintiff remotely in 2022 and documented symptoms of "recurrent active colitis." Resp. [120-10] at 2. Dr. Shiao reported "that [Plaintiff] has not received what would be considered [the] standard of care for management of chronic inflammatory bowel disease . . . with evidence of active colitis since incarceration." *Id*.

But this evidence does not create a genuine dispute of material fact on the issue of deliberate indifference for two reasons. First, Plaintiff's evidence was generated in 2022—two years after his inflammatory symptoms began in 2020 and well after this lawsuit was filed in 2021. This evidence does not demonstrate that the tests performed in 2020 were inappropriate or incorrect but simply that Plaintiff's condition may have developed or worsened over time. Second, this evidence merely shows Plaintiff's "disagreement with his medical treatment," which does not constitute deliberate indifference. *See Gobert v. Caldwell*, 463 F.3d 339, 346 (5th Cir. 2006). "Differences of opinion among physicians as to the appropriate method of treatment do not constitute deliberate indifference." *Dickerson v. Strain*, No. 08-4651, 2009 WL 2023866, at *5 (E.D. La. July 9, 2009). Even if Plaintiff could prove

that he was treated incorrectly in 2020, his "federal claim would still fail because it is indisputable that an incorrect diagnosis simply does not suffice to state a claim for deliberate indifference." *See id*. at *6. "Rather, misdiagnosis amounts to nothing more than negligence or malpractice which alone is never sufficient to state a federal claim for constitutionally inadequate medical care." *Id*.

In sum, the competent summary-judgment evidence shows that Plaintiff communicated his ailments to medical providers at JCADC, who conducted testing and concluded that additional medical intervention was not warranted. And Plaintiff made no more requests about ulcerative colitis from December 31, 2020, until the Omnibus Hearing on January 11, 2022. Mem. [113] at 4. Plaintiff having received testing and treatment, his § 1983 claims against the Vital Core Defendants about his ulcerative colitis should be dismissed with prejudice.

### iii.    *Treatment for Knee Injury*

Next, the Vital Core Defendants are entitled to judgment as a matter of law on Plaintiff's claims about his knee injury because Plaintiff has again failed to demonstrate that they acted with deliberate indifference. That is, Plaintiff has failed to show that the Vital Core Defendants knew of and disregarded Plaintiff's serious medical need. *See* Mem. [113] at 11-15.

"Because society does not expect that prisoners will have unqualified access to health care, deliberate indifference to medical needs amounts to an Eighth Amendment violation only if those needs are serious." *Hudson v. McMillian*, 503 U.S.

14

1, 9 (1992) (quotation omitted). "A serious medical need is one for which treatment has been recommended or for which the need is so apparent that even laymen would recognize that care is required." *Gobert*, 463 F.3d at 345 n.12. "In this context, it is 'obduracy and wantonness, not inadvertence or error in good faith,' that characterizes the conduct prohibited by the Eighth Amendment." *Baughman v. Garcia*, 254 F. Supp. 3d 848, 869 (S.D. Tex. 2017) (quoting *Bradley v. Puckett*, 157 F.3d 1022, 1025 (5th Cir. 1998)).

To start, the undersigned agrees that Plaintiff's knee injury did not amount to a "serious medical need" sufficient to state a constitutional violation. *See* Mem. [113] at 11-14. Plaintiff avers that, after his fall, his knee was "severely swollen," and he "could barely walk." Am. Compl. [7] at 9. As a result, he asked for ice, ibuprofen, and to see a doctor. *Id*. But Plaintiff purchased and used ibuprofen "from [the] canteen" to treat his knee injury. Mot. [112-1] at 3; *see also* Resp. [121] at 3. He was also permitted to wear a "knee brace," *id*., but rejected that solution because "it would require that [he] be held in medical observation," Resp. [120] at 7. Subsequently, Plaintiff made no more medical requests on the kiosk about his knee injury. At no point did he complain about lasting structural damage to the joint or a prolonged inability to walk. In fact, Plaintiff admits that his condition (including pain and swelling) only lasted "[f]or two weeks." Resp. [120] at 7.

In other words, "Plaintiff does not describe his symptoms as severe or long-lasting," and his own admission "establishes that any injury . . . healed without

medical intervention in . . . two weeks." *See Tucker v. Holt*, No. 6:21-cv-249, 2022 WL 3753952, at *6 (E.D. Tex. July 11, 2022) (reiterating that a "*de minimis* injury simply [does] not establish a serious medical need" under the Eighth Amendment). Thus, Plaintiff's temporary knee injury, accompanied by limited swelling, discomfort, and mobility issues, does not establish a serious medical need within the constitutional calculus. *E.g.*, *Raspberry v. Johnson*, No. 00-40591, 2001 WL 1692494, at *1 (5th Cir. Nov. 29, 2001) (holding that an "injured hand and bruised head" were not serious medical needs where the injuries healed on their own and the plaintiff suffered no broken bones); *Wesson v. Oglesby*, 910 F.2d 278, 284 (5th Cir. 1990) (holding that "swollen wrists with some bleeding" do not constitute a serious medical need); *Dotson v. Corr. Med. Servs.*, 584 F. Supp. 2d 1063, 1068 (W.D. Tenn. 2008) (holding that an ankle sprain with soft-tissue swelling and inability to bear weight did not rise to the level of a serious medical need).

Regardless, Plaintiff has not shown that the Vital Core Defendants knew of and disregarded the extent of his injury. In response to their summary-judgment motion, Plaintiff offers five-year-old medical records to demonstrate that he suffered "a complete rupture of the ACL and a tear of the medical meniscus" in or around early 2018, Resp. [120-14] at 1—two years before he entered JCADC custody. At that time, his treating physician recommended "knee stabilizing surgery," but advised that "this can be treated conservatively with bracing and physical therapy and pain control with NSAIDs and injections." *Id*. No evidence suggests that Plaintiff pursued the primary

16

recommendation of his doctor at that time.

Moreover, Plaintiff offers no evidence that the Vital Core Defendants had ever seen these records or otherwise knew of his pre-existing condition. Instead, the Vital Core Defendants unknowingly honored the secondary recommendation of Plaintiff's earlier physician by offering pain relievers and bracing as prospective solutions for his knee injury. That Plaintiff rejected the bracing option and ultimately abandoned the knee-injury complaint altogether underscores the *de minimis* nature of his knee injury and refutes his argument that the Vital Core Defendants acted with deliberate indifference. *See Gibson v. Collier*, 920 F.3d 212, 220 (5th Cir. 2019) ("There is no Eighth Amendment claim just because an inmate believes that medical personnel should have attempted different diagnostic measures or alternative methods of treatment." (quotations omitted)). Plaintiff's claims against the Vital Core Defendants about his knee injury should be dismissed with prejudice.

### iv. *Medical Malpractice and Negligence Claims*

Finally, the Vital Core Defendants argue that Plaintiff's medical-malpractice and negligence claims arising under state law must be dismissed for two reasons. Mem. [113] at 18-26. First, Plaintiff failed to designate an expert to testify to each element of his medical-malpractice claim. *Id*. at 18-19. Second, Plaintiff failed to comply with the pre-suit notice requirement under Mississippi Code § 15-1-36(15). The undersigned agrees that Plaintiff failed to provide the requisite pre-suit notice, and his claims against the Vital Core Defendants arising under state-law must

17

therefore be dismissed without prejudice.

"No action based upon the health care provider's professional negligence may be begun unless the defendant has been given at least sixty (60) days' prior written notice of the intention to begin the action.  No particular form of notice is required, but it shall notify the defendant of the legal basis of the claim and the type of loss sustained, including with specificity the nature of the injuries suffered."  MISS. CODE ANN. § 15-1-36(15).  This requirement of pre-suit notice is substantive, not procedural, so it applies with equal force in this federal action.  *See Redmond v. Astrazeneca Pharms. LP*, 492 F. Supp. 2d 575, 578 (S.D. Miss. 2007).

The Mississippi Supreme Court recognizes the sixty-day pre-suit notice requirement as a mandatory prerequisite to filing a medical-malpractice lawsuit. *Pitalo v. GPCH-GP, Inc.*, 933 So. 2d 927, 929 (Miss. 2006).  "Th[e] Court requires strict compliance with Section 15-1-36(15); the failure to satisfy the presuit-notice requirement mandates dismissal without prejudice."  *Fowler v. White*, 85 So. 3d 287, 291 (Miss. 2012); *see also Herrington v. Promise Specialty Hosp.*, 665 F. Supp. 2d 708, 711 (S.D. Miss. 2009) ("The Mississippi courts have made it clear that failure to provide sixty days' written notice before beginning a medical malpractice action results in dismissal without prejudice.").  *Pro se* litigants are not excepted from this rule.  *See Harris v. Barnett*, No. 3:19-cv-00583-CWR-FKB, 2021 WL 2307322, at *2 (S.D. Miss. May 13, 2021) (recommending dismissal of *pro se* plaintiff's negligence claims for failure to comply with the pre-suit notice requirement), *report and*

18

*recommendation adopted by* 2021 WL 2301929, at *1 (S.D. Miss. June 4, 2021).

Plaintiff filed this lawsuit on June 2, 2021, and the Vital Core Defendants aver that they did not receive timely pre-suit notice beforehand. Mem. [113] at 20-24. During discovery, Plaintiff advised the Vital Core Defendants that his kiosk requests satisfied the pre-suit notice requirement, Mot. [112-4] at 5, but only two of his kiosk requests arguably threaten legal action. First, on December 29, 2020, Plaintiff wrote: "I guess nurses are doctors, fortune tellers and now judges and jurors. I hope you are attorneys also as very soon you may also find yourself as a defendant." Mot. [112-1] at 7. But this request does not particularly identify any prospective defendant and thus fails to satisfy the requirement of "strict compliance with Section 15-1-36(15)." *See Spann v. Wood*, 269 So. 3d 10, 12-13 (Miss. 2018) (holding that "the plain language of Section 15-1-36(15) required [the plaintiff] to provide presuit notice to each of the nurses"). Second, on August 12, 2021, Plaintiff wrote: "See you and the owners of vital core jackson ms and ct corporations texas in court very soon." Mot. [112-1] at 13. But that request was lodged *after* Plaintiff initiated this lawsuit, so it cannot by design satisfy the requirement of pre-suit notice.

Now, Plaintiff argues that he provided written notice of this lawsuit to all Defendants approximately 90 days before filing the Complaint. Resp. [121] at 12. As proof, he attached four certified mail receipts—two dated March 2, 2021, one dated March 4, 2021, and one dated March 24, 2021. Resp. [120-15] at 1. The receipts do not contain the name of a recipient or a physical address, but simply reflect delivery

to Gulfport, Mississippi; Pascagoula, Mississippi; and Austin, Texas.  *Id.*  Notably, Plaintiff has not provided copies of the written notices for the Court's review—despite the Vital Core Defendants subsequently arguing that the certified-mail receipts are insufficient to satisfy the pre-suit notice requirement.  Reb. [124] at 12.  The undersigned agrees.  Without copies of the written notices, the undersigned cannot be sure the alleged notices exist—much less evaluate the sufficiency of them. Plaintiff has failed to create a genuine issue of material fact on this point.  *See Ducksworth v. Woodall*, No. 1:13-cv-00486-MTP, 2015 WL 1457498, at *2 (S.D. Miss. Mar. 30, 2015) ("[T]he nonmoving party cannot defeat summary judgment with conclusory allegations, unsubstantiated assertions, or only a scintilla of evidence.  In the absence of proof, the Court does not assume that the nonmoving party could or would prove the necessary facts." (quotations and citations omitted))

Failing to comply with the pre-suit notice requirement means that Plaintiff's medical-malpractice claims were "not lawfully filed" and were of "no legal effect."  *See Herrington*, 665 F. Supp. 2d at 710 (quotations omitted).  "Dismissal for failure to provide notice is comparable to dismissal for lack of jurisdiction."  *Id.*  Thus, Plaintiff's medical-malpractice claims arising under state law must be dismissed without prejudice.  Accepting the argument about pre-suit notice, the undersigned declines to resolve the Vital Core Defendants' argument about expert testimony.  *See McNally v. Inch*, No. 3:17-cv-00847-CWR-JCG, 2020 WL 1281631, at *3 (S.D. Miss. Jan. 28, 2020), *report and recommendation adopted by* 2020 WL 1277204, at *1 (S.D. Miss.

Mar. 17, 2020) (declining to address the merits of plaintiff's claims after dismissing them without prejudice for lack of pre-suit notice).

### B. The County Defendants' Motion [107] for Summary Judgment

Plaintiff has sued each of the County Defendants in their official and individual capacities. Compl. [1] at 5. He specifies six allegations against the County Defendants, including: (1) that Deputy Drummond refused to give him extra toilet paper; (2) that JCADC personnel refused to provide him with a face mask during the COVID-19 pandemic; (3) that he suffered a lack of privacy while housed at JCADC; (4) that Deputy Barnes opened Plaintiff's legal mail outside his presence; (5) that JCADC personnel used dirty hair clippers on inmates; and (6) that the overuse and misuse of lighting at JCADC amounts to an unconstitutional condition of confinement. Given the volume of Plaintiff's filings, the undersigned will first address the allegations directed at each of the County Defendants, followed by the allegations not directed at any of the named Defendants in this lawsuit.

### i. Sheriff Ezell

First, Plaintiff sued Sheriff Ezell in his official and individual capacities because Plaintiff "made [Sheriff Ezell] aware of the problems [he was] having, and [Sheriff Ezell] did not rectify them to [Plaintiff's] satisfaction." (Tr. 47). In other words, Sheriff Ezell "[was] the sheriff and he [was] overall in charge of the facility." (Tr. 28). The undersigned will first address Plaintiff's official-capacity allegations, followed by his individual-capacity allegations.

21

### *a. Official-Capacity Claims*

"A suit against a municipal official in his official capacity is no different from a suit against the municipality itself." *Thomas v. City of Galveston*, 800 F. Supp. 2d 826, 833 (S.D. Tex. 2011) (citing *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989)); *see also Seibert v. Jackson Cnty.*, No. 1:14-cv-00188-KS-MTP, 2014 WL 4146487, at *2 (S.D. Miss. Aug. 19, 2014) ("When a plaintiff asserts official-capacity claims against a government official under Section 1983, the real party in interest is the government entity." (quotation and alterations omitted)). "In order to maintain his official capacity claims, [Plaintiff] must establish a constitutional violation, and must satisfy the three requirements necessary to impose municipal liability: that there was an official policy, practice or custom which would subject [Jackson] County to section 1983 liability; that the official policy is linked to the constitutional violation(s); and that the official policy reflects [Jackson County's] deliberate indifference to that injury." *Eason v. Frye*, 972 F. Supp. 2d 935, 943 (S.D. Miss. 2013) (citing *Lawson v. Dallas Cnty.*, 286 F.3d 257, 263 (5th Cir. 2002)).

Plaintiff suggests that Sheriff Ezell failed to properly train and supervise his employees at JCADC. Resp. [115] at 5. "A municipality's failure to properly train or supervise its employees can be a policy or custom giving rise to § 1983 liability." *Eason*, 972 F. Supp. 2d at 945. "[Plaintiff] must prove that: (1) the training procedures of the municipality's policymaker were inadequate; (2) the municipality's policymaker was deliberately indifferent in adopting the training policy[;] and (3) the

inadequate training policy directly caused the constitutional deprivation." *See id*. "The description of a policy or custom and its relationship to the underlying constitutional violation . . . cannot be conclusory; it must contain specific facts." *Spiller v. City of Tex. City Police Dep't*, 130 F.3d 162, 167 (5th Cir. 1997).

Assuming Plaintiff has established some constitutional violation, Plaintiff has alleged "no specific policy statement, ordinance, regulation, or decision" of Jackson County "that was the moving force" behind the alleged constitutional violations against him. *See Ducksworth v. Rook*, No. 2:14-cv-00146-KS-MTP, 2015 WL 737574, at *2 (S.D. Miss. Feb. 20, 2015). Instead, Plaintiff avers the following in conclusory fashion: "The unlawful government action was part of the public entity's policy or custom, and a connection existed between the specific policy or custom and the violations of Plaintiff." Resp. [116] at 8. Plaintiff does not identify this policy or custom by name or description, nor does he specifically describe its relationship to a particular constitutional violation. He does not specify how JCADC employees were trained, nor does he describe how that training was inadequate under the circumstances. And Plaintiff makes no allegation that JCADC has an official policy or well-settled custom of denying inmates adequate medical care; needlessly invading their privacy; or maintaining unconstitutional conditions of confinement. His allegations merely represent what he says happened to him and a few other inmates on limited occasions. *See* Resp. [115-1] at 1-10 (affidavits from other inmates).

Plaintiff has thus failed to demonstrate "a persistent, widespread practice so

23

common and well-settled as to constitute a custom that fairly represents a municipal policy." *See Ducksworth*, 2015 WL 737574, at *2 (quotations and alterations omitted). Sheriff Ezell is entitled to judgment as a matter of law on Plaintiff's official-capacity claims against him. Plaintiff's official-capacity claims against Sheriff Ezell should be dismissed with prejudice.

### b. Individual-Capacity Claims

Plaintiff's individual-capacity claims against Sheriff Ezell fare no better. Plaintiff argues that his mother repeatedly advised Sheriff Ezell of Plaintiff's problems while he was housed at JCADC, and Sheriff Ezell refused to intervene to Plaintiff's benefit. (Tr. 28, 47-48); *see also* Resp. [115] at 4. Plaintiff appears to concede that Sheriff Ezell was not personally involved in any of the alleged constitutional violations against him. *See* Resp. [115] at 4. Instead, he argues that a sheriff not personally involved in unconstitutional acts may be "held liable . . . if the [s]heriff failed to train or supervise officers involved." *Id.* (quotations omitted); *see also* Reb. [122] at 3.

"Under section 1983, supervisory officials are not liable for the actions of subordinates on any theory of vicarious liability." *Thompkins v. Belt*, 828 F.2d 298, 303 (5th Cir. 1987). "To state a cause of action under § 1983, the plaintiff must allege facts reflecting the defendants' participation in the alleged wrong, specifying the personal involvement of each defendant." *Jones v. Epps*, No. 2:10-cv-00077-MTP, 2010 WL 3455414, at *2 (S.D. Miss. Aug. 27, 2010) (quotation omitted). In other

words, a supervisor can be held liable under § 1983 only "if (1) the supervisor affirmatively participates in the acts that cause the constitutional deprivation, or (2) the supervisor implements unconstitutional policies that causally result in the constitutional injury." *Pena v. City of Rio Grande City*, 879 F.3d 613, 620 (5th Cir. 2018). "In order to establish supervisor liability for constitutional violations committed by subordinate employees, plaintiff must show that the supervisor acted, or failed to act, with deliberate indifference to violations of others' constitutional rights committed by their subordinates." *Id*.

"Deliberate indifference is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Estate of Davis ex rel. McCully v. City of N. Richland Hills*, 406 F.3d 375, 381 (5th Cir. 2005) (quotation and alterations omitted). "For an official to act with deliberate indifference, 'the official must be both aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.'" *Smith v. Brenoettsy*, 158 F.3d 908, 912 (5th Cir. 1998) (quoting *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)). "[F]or liability to attach based on an 'inadequate training' claim, a plaintiff must allege with specificity how a particular training program is defective." *Roberts v. City of Shreveport*, 397 F.3d 287, 293 (5th Cir. 2005) (quoting *Benavides v. Cnty. of Wilson*, 955 F.2d 968, 973 (5th Cir. 1992)). "To satisfy the deliberate indifference prong, a plaintiff usually must demonstrate a pattern of violations and that the inadequacy of the training is 'obvious and obviously

likely to result in a constitutional violation.'" *Cousin v. Small*, 325 F.3d 627, 637 (5th Cir. 2003) (quoting *Thompson v. Upshur Cnty.*, 245 F.3d 447, 459 (5th Cir. 2001)).

Plaintiff offers the Court no competent summary-judgment evidence to show that Sheriff Ezell acted with deliberate indifference toward him. That is, assuming Sheriff Ezell was aware of Plaintiff's complaints, this record does not demonstrate that Sheriff Ezell disregarded them. To start, Plaintiff seems to blame Sheriff Ezell, in part, for the alleged denial of medical care. Resp. [115] at 4. But the evidence shows the Vital Core Defendants were not deliberately indifferent to Plaintiff's serious medical needs, *see supra* at 9-17, which hamstrings his claim that Sheriff Ezell disregarded a known or obvious risk to Plaintiff's health simply by overseeing the jail staff. Moreover, Sheriff Ezell "contracts with a third party . . . to provide medical services for the jail." Reb. [119] at 4. He is not "medically trained," but "relie[s] on the medical contractor to attend to the medical needs of inmates, including [Plaintiff]." *Id*. at 6. That reliance is reasonable, and it also undercuts Plaintiff's argument that Sheriff Ezell disregarded a known or obvious risk to Plaintiff's health. *See Belcher v. Lopinto*, 492 F. Supp. 3d 636, 659 (E.D. La. 2020) (declining to impose municipal liability on a sheriff's office for an inmate's medical care where a healthcare provider was "the only entity responsible for providing medical care to inmates").

Nor has Plaintiff established that Sheriff Ezell was deliberately indifferent by inadequately training JCADC employees. Again, Plaintiff has not established that any of his allegations against the County Defendants amount to a constitutional

26

violation. *See infra* at 27-43. And Plaintiff has identified no "particular training program" responsible for the alleged constitutional violations, *see Roberts*, 397 F.3d at 293—much less that it was defective. Sheriff Ezell is entitled to judgment as a matter of law on Plaintiff's individual-capacity claims against him, and these claims should be dismissed with prejudice.

### ii.    Captain Nelson

Second, Plaintiff's allegations against Captain Nelson mirror his allegations against Sheriff Ezell. (Tr. 29, 47). That is, Captain Nelson "is the supervisor over all the deputies." (Tr. 29). Allegedly, he was "personally aware" of Plaintiff's complaints and "did not rectify [them] to [Plaintiff's] satisfaction." (Tr. 47). For the same reasons discussed above, Captain Nelson is also entitled to judgment as a matter of law on Plaintiff's official- and individual-capacity claims against him. *See supra* at 22-27. Plaintiff's claims against Captain Nelson should also be dismissed with prejudice.

### iii.    Deputy Drummond

Third, Plaintiff blames Deputy Drummond for refusing to give him extra toilet paper, despite the need presented by his alleged ulcerative colitis. (Tr. 22). According to Plaintiff, Deputy Drummond "told [him] to use [his] hand," "smiled," and "everybody kind of got a kick out of it." *Id.* But Plaintiff's official-capacity claims against Deputy Drummond fail for the same reasons discussed above. *See supra* at 22-24. Specifically, Plaintiff has not identified a policy, practice, or custom of Jackson County to deny extra toilet paper to inmates suffering bowel disruptions—only that

27

he was denied this convenience. Nor could he argue that any such policy exists, as Plaintiff was informed on the kiosk that an order had been written to authorize extra toilet paper for his use. Mot. [112-1] at 13. Whether he received the extra toilet paper is irrelevant to this analysis; the order authorizing extra toilet paper shows that Jackson County did not have an official policy or custom of denying it. Thus, Deputy Drummond is entitled to judgment as a matter of law on Plaintiff's official-capacity claims against her.

Likewise, Deputy Drummond is entitled to judgment as a matter of law on Plaintiff's individual-capacity claims against her because the denial of extra toilet paper does not rise to the level of a constitutional violation. Plaintiff admits that he was issued one roll of toilet paper every Saturday or Sunday but complains that he needs more "because of [his] ulcerative colitis." (Tr. 45). He does not link any physical injury with the denial of extra toilet paper but laments the embarrassment of being told to use his hands. (Tr. 22). Curiously, fellow inmate LaBarrian Tims testified by affidavit that he gave Plaintiff "extra toilet paper every other week," Resp. [115-1] at 3, and fellow inmate Gage Michael Hendricks testified by affidavit that Plaintiff's toilet twice "backed up and overflowed onto the floor because of so *much* toilet paper," *id*. at 2 (emphasis added).

"[T]he Eighth Amendment may afford protection against conditions of confinement which constitute health threats but not against those which cause mere discomfort or inconvenience." *Wilson v. Lynaugh*, 878 F.2d 846, 849 (5th Cir. 1989).

"Inmates cannot expect the amenities, conveniences, and services of a good hotel." *Id.* at 849 n.5 (quotation and citation omitted). The summary-judgment record reveals that Plaintiff received as much toilet paper from JCADC personnel as other inmates (Tr. 45)—and even more toilet paper from the kindness of his fellow inmates, Resp. [115-1] at 2-3. Insofar as Plaintiff "has not alleged that he has suffered any harm [from the lack of extra toilet paper] . . . , this claim must be dismissed." *See Caston v. Harris*, No. 4:12-cv-00032-A-V, 2012 WL 5389745, at *3 (N.D. Miss. June 12, 2012), *report and recommendation adopted by* 2013 WL 752495, at *1 (N.D. Miss. Feb. 27, 2013) (rejecting Eighth Amendment claim that a prisoner "only receives toilet tissue . . . in very small amounts about once per week"); *see also Garcia v. Currie*, 674 F. App'x 432, 433 (5th Cir. 2017) (finding no Eighth Amendment violation where a prisoner "was clothed only in a paper gown in a cold, bare cell and was not given soap, daily showers, or free access to running water or toilet paper"); *Byrd v. Adams*, 389 F. App'x 411, 412 (5th Cir. 2010) (affirming dismissal of allegations that a prisoner suffered hemorrhoids and peeling skin because he only received one roll of toilet paper per week).

To the extent Plaintiff complains that Deputy Drummond embarrassed him, "verbal abuse and humiliation are not actionable under § 1983." *See Reese v. Skinner*, 322 F. App'x 381, 382 (5th Cir. 2009). "[H]urt feelings, anger, and frustration are a part of life and are not themselves sufficient to establish one's entitlement to compensatory damages." *Cox v. City of Jackson*, 343 F. Supp. 2d 546, 576 (S.D. Miss.

2004).  Without a showing of physical injury, Plaintiff cannot recover on his claim that Deputy Drummond embarrassed him.  All of his claims against her should be dismissed with prejudice.

### iv.    *Deputy Barnes*

Finally, Plaintiff blames Deputy Barnes for opening his legal mail outside his presence and, on occasion, withholding his legal mail altogether.  (Tr. 45).  He argues that mail should be "opened in [his] presence," and there should be a "chain of custody in place" to ensure that legal mail is properly delivered.  (Tr. 46).  But Plaintiff's official-capacity claims against Deputy Barnes also fail for the same reasons discussed above.  *See supra* at 22-24.  Specifically, Plaintiff has not identified a policy, practice, or custom of Jackson County to interfere with inmates' legal mail—only that it happened to him during his stay at JCADC.  In fact, Deputy Barnes has submitted unrebutted summary-judgment evidence to show that JCADC has an affirmative policy or custom of *not* interfering with inmates' legal mail.  Mot. [107-3] at 1-2.  Thus, Deputy Barnes is entitled to judgment as a matter of law on Plaintiff's official-capacity claims against him.

Plaintiff's individual-capacity claims against Deputy Barnes also fail because Plaintiff has no constitutional right to supervise the processing of his legal mail into JCADC.  "The control of mail to and from prisoners is a necessary adjunct of penal administration."  *Marshall v. Allison*, No. 1:08-cv-01387-RHW, 2011 WL 601178, at *5 (S.D. Miss. Feb. 11, 2011).  "[I]t is well settled that an inmate does not have a

30

constitutional claim if his incoming legal mail is opened outside of his presence."
*Miskell v. Forrest Cnty. Jail*, No. 2:14-cv-00172-KS-MTP, 2014 WL 6634977, at *2
(S.D. Miss. Nov. 21, 2014); *see also Brewer v. Wilkinson*, 3 F.3d 816, 825 (5th Cir.
1993) (holding that prisoners do not have a constitutional right to be present when
privileged, legal mail is opened and inspected).  Even if Plaintiff's legal mail had been
opened outside of his presence, his claim against Deputy Barnes would fail as a
matter of law.

Further, Deputy Barnes testified by affidavit that Plaintiff's legal mail was *not*
opened outside his presence.  Mot. [107-3] at 1-2.  As the Records Clerk at JCADC,
Deputy Barnes "open[s] mail that is not official legal mail [to] make sure that it
doesn't contain contraband such as staples, paperclips, or any other items that the
inmates are not allowed to possess."  *Id.* at 1.  "[O]nly mail from elected officials, a
Court, or an attorney may be marked 'Legal' in order for [Deputy Barnes] to have [it
delivered] to an inmate unopened."  *Id.*  When mail properly marked "legal" is
processed into JCADC, Deputy Barnes generates a receipt, has a deputy deliver and
open the mail in the inmate's presence, and both the deputy and the inmate sign the
receipt.  *Id.*

Plaintiff rebuts Deputy Barnes's testimony on two points.  First, he says that
mail from Melody Scott, his mother and durable power of attorney, was marked
"legal" but retained by JCADC personnel.  Resp. [115] at 3.  Deputy Barnes
acknowledges that "[t]here were seven occasions" during Plaintiff's stay at JCADC

31

when his mother attempted to send him mail marked "legal."  Mot. [107-3] at 1-2.
Each time, Deputy Barnes returned the mail to Plaintiff's mother, with the notation
that legal mail "must come from a verified attorney, elected official or the courts."  *Id.*
at 2 (emphases omitted).

Second, Plaintiff alleges he received legal mail from Attorneys Rufus Alldredge
and Chuck Bordis that was already opened.  Resp. [115] at 3.  But Plaintiff offers no
competent summary-judgment evidence to support this allegation, and he "cannot
defeat summary judgment with conclusory allegations, unsubstantiated assertions,
or only a scintilla of evidence."  *See Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d
337, 343 (5th Cir. 2007) (quotation and citation omitted).  And Plaintiff does not claim
a denial of access to the courts—even if these two pieces of mail were "received open."
Resp. [116] at 10.  Plaintiff admits receiving this correspondence, so it cannot be said
that Deputy Barnes "hindered his efforts to pursue a legal claim" that was
"nonfrivolous."  *See Lewis v. Casey*, 518 U.S. 343, 351 (1996).  All of Plaintiff's claims
against Deputy Barnes should be dismissed with prejudice.

### v.    *Unattributed Allegations*

Four of Plaintiff's allegations against the County Defendants are not
attributed to any one of them in particular.  These claims should be dismissed for
Plaintiff's failure to allege the personal involvement of any named Defendant.  *See
Jackson v. Pinney*, No. W-21-CA-047-ADA, 2021 WL 7711172, at *3 (W.D. Tex. Sept.
7, 2021) (dismissing medical-care claims as frivolous, in part, because the prisoner

plaintiff "fail[ed] to name anyone who was personally responsible" for them). Notwithstanding that infirmity, Plaintiff's remaining allegations fail to state a constitutional violation.

### a. Refusal to Provide Face Mask

Though it is unclear whether Plaintiff ever contracted COVID-19,[4] he complains that JCADC personnel refused to provide him with a face mask. Am. Compl. [7] at 24; (Tr. 33). The County Defendants argue that Plaintiff has abandoned this claim by failing to address it in his summary-judgment response. Reb. [119] at 2. It is true that a party's failure to pursue a particular claim beyond the pleadings constitutes waiver or abandonment of that claim. *Gulfstream Property and Cas. Ins. Co. v. Alarm.com, Inc.*, No. 5:21-cv-00052-DCB-LGI, 2022 WL 1541290, at *2 n.1 (S.D. Miss. May 16, 2022) ("Given that Plaintiff has failed to address this claim in its response to the Motion, the Court finds that the claim has been waived."). But this claim fails on the merits too.

"There is no doubt that infectious diseases generally and COVID-19 specifically can pose a risk of serious or fatal harm to prison inmates." *Valentine v. Collier*, 956 F.3d 797, 801 (5th Cir. 2020). Under the Fourteenth Amendment, prison officials

---

[4] The record contains no evidence that Plaintiff ever tested positive for COVID. When asked at the Omnibus Hearing whether he had ever contracted COVID, Plaintiff responded: "Your Honor, we asked for -- that again goes into not checking us out through medical. We got on the kiosk asking them to come in and test us. . . . One time I was tested, Your Honor, and it was after they had quarantined off a section of our quad, and I haven't been tested since then or given a booster." (Tr. 33). Plaintiff averred that he once "thought [he] had COVID," and his symptoms were "headache, runny nose, snot, [sore] throat, [and] hoarseness," along with "chills," for "a little over a week." *Id.* at 33-34.

have a duty to provide pretrial detainees in their custody "with basic human needs, including . . . protection from harm, during their confinement." *Hare v. City of Corinth*, 74 F.3d 633, 650 (5th Cir. 1996). "To establish a failure-to-protect claim under § 1983, the plaintiff must show that [he] was detained under conditions posing a substantial risk of serious harm and that prison officials were deliberately indifferent to [his] need for protection." *Wade v. Lee Cnty.*, No. 1:21-cv-00098-DAS, 2023 WL 3276435, at *3 (N.D. Miss. May 5, 2023) (citing *Neals v. Norwood*, 59 F.3d 530, 533 (5th Cir. 1995)).

The County Defendants' alleged failure to provide face masks during the early days of the COVID-19 pandemic does not amount to a constitutional violation. *E.g.*, *Wade*, 2023 WL 3276435, at *4 ("With respect to the use of face masks, the defendant's alleged failure to require their use or provide them to pretrial detainees in July/August of 2020 is insufficient to establish a constitutional violation."); *May v. McLane*, No. 5:21-cv-00271-BQ, 2022 WL 4353562, at *6 (N.D. Tex. Aug. 8, 2022) (same). Captain Nelson testified by affidavit that JCADC's COVID-19 guidelines "evolved and changed" during early 2020. Mot. [107-1] at 1. In the beginning, employees were screened for fever before every shift; each new inmate was tested for COVID-19 and subsequently isolated for six weeks before joining the general population; and JCADC personnel checked the temperature of each inmate entering the booking area. *Id.* at 1-2. JCADC personnel also "began decontamination spraying of the dayrooms at tier change daily" with a "germicide [that was] shown to kill the

34

coronavirus." *Id*. at 2.  Notably, JCADC personnel "provided masks to inmates when those masks were available."  *Id*.  This evidence shows that the County Defendants took measures "to abate and control the spread of the virus."  *See Valentine*, 956 F.3d at 802.

These early efforts to curb the spread of COVID-19 were successful in JCADC until January 2021, "when courts resumed and prisoners were taken to court for appearances."  *Id*.  Though COVID-19 entered the facility at that time, "no prisoner was sick enough to require hospitalization."  *Id*.  Based on this unrebutted testimony, the undersigned concludes that JCADC personnel did not disregard the substantial risk presented by COVID-19 "by failing to take reasonable measures to abate it."  *See Torres v. Livingston*, 972 F.3d 660, 663 (5th Cir. 2020).  Deliberate indifference is not apparent on the face of this record, and Plaintiff's claim regarding the refusal to provide face masks does not establish a constitutional violation.  This claim should be dismissed with prejudice.

### b. *Lack of Privacy*

Next, Plaintiff claims that he suffered a lack of privacy while housed at JCADC.  Specifically, Plaintiff claims (1) that he was strip searched in front of others, Am. Compl. [7] at 9, 2021; (Tr. 30); (2) that he was forced to conduct attorney-client communication on recorded telephone lines, (Tr. 34-35); and (3) that he was forced to answer medical-screening questions in front of other people, Am. Compl. [7] at 7; (Tr. 17).  The last of these claims—that Plaintiff was forced to reveal medical information

in the hearing of non-medical personnel—has already been dismissed for lack of subject-matter jurisdiction, Order [51] at 5, leaving only two privacy-related claims.

First, Plaintiff alleges that he and fellow inmates were twice strip searched in full view of surveillance cameras and large windows while female deputies were on duty. Am. Compl. [7] at 20-21. Inmate Hendricks testified by affidavit that he was strip searched with Plaintiff, and they "were not given a reason why [the officers] would be conducting a strip search." Resp. [115-1] at 1. Moreover, Hendricks "personally saw a female deputy laughing at [them]" during the process. *Id*. Plaintiff does not object to the use of strip searches generally; rather, he "object[s] to the manner in which" these strip searches were conducted. Resp. [116] at 9.

Again, Plaintiff has failed to establish a constitutional violation on these facts. The Fifth Circuit Court of Appeals recognizes that prisoners possess only a "minimal" right to bodily privacy while in custody. *Oliver*, 276 F.3d at 744-45. "The Supreme Court has mandated a lower standard of review for prison regulations claimed to inhibit the exercise of constitutional rights." *Id*. at 745 (quotation omitted). Accordingly, the Court must "give great deference to prison administrators' judgments regarding jail security," and these regulations "need only be 'reasonably related to legitimate penological interests.'" *Id*. (quoting *Turner v. Safley*, 482 U.S. 78, 89 (1987)). Generally, "strip searches carried out in nonsecluded areas of the prison and in the presence of prison employees of the opposite sex are not unconstitutional." *Tasby v. Lynaugh*, 123 F. App'x 614, 615 (5th Cir. 2005).

According to JCADC policy, "searches of all types are conducted to detect and prevent the introduction of contraband, to recover missing or stolen property, protect inmates and staff from harm, detect . . . and improve medical conditions, and to suppress escape attempts . . . and disturbances." Mot. [107-2] at 1-2. The policy requires "[d]eputies [to] use reasonable care in conducting personal searches, while according reasonable privacy to the inmate or detainee." *Id*. at 2 (emphasis omitted). "Strip searches are [to be] conducted in a respectful and dignified manner by a trained Deputy of the same gender." *Id*. at 3 (emphasis omitted).

After reviewing this policy, the undersigned finds that JCADC's use of strip searches for pretrial detainees is (and was in this case) reasonably related to the legitimate penological interest of maintaining security in the facility. And Plaintiff has not submitted evidence to show that "the manner in which" his strip searches were conducted is legally problematic. Resp. [116] at 9. He seems to take most issue with the fact that female deputies could *see* the strip searches; at no point do Plaintiff or his affiants say that female deputies *conducted* the strip searches. *Compare Hamer v. Jones*, 364 F. App'x 119, 124-25 (5th Cir. 2010) ("A strip search of a male prisoner by a female guard in the absence of exigent circumstances presents a colorable Fourth Amendment claim."), *with Letcher v. Turner*, 968 F.2d 508, 510 (5th Cir. 1992) ("[T]here is no basis for Letcher's claim of a constitutional violation due to the presence of female guards during the strip search."); *see also Colone v. Woods*, No. 1:16-cv-00113, 2021 WL 1146201, at *14 (E.D. Tex. Feb. 23, 2021) ("In considering

whether a particular strip search is constitutional, the Fifth Circuit Court of Appeals distinguishes between a female officer participating in a cross-gender strip search or merely viewing a strip search in an incidental fashion."), *report and recommendation adopted by* 2021 WL 1134241, at *1 (E.D. Tex. Mar. 23, 2021).  In fact, Plaintiff affirmatively avers that these strip searches were conducted by two male deputies. Resp. [116] at 9.  And the alleged laughter of the female guards is not constitutionally actionable.  *See Parker v. Woods*, 834 F. App'x 92, 97 (5th Cir. 2020) (finding evidence that one guard "smiled" at a prisoner's nudity during a search was not actionable).

Thus, the record reveals that Plaintiff's strip searches were consistent with applicable law.  Even if JCADC violated its own policy in conducting the searches, the facility's rules "do not set the outer constitutional limits on strip searches."  *See McCreary v. Richardson*, 738 F.3d 651, 658 (5th Cir. 2013).  If Plaintiff wishes to challenge a violation of JCADC policy, his remedy lies not in § 1983 but with the prison grievance system and in state law.  *See id*.  This claim should be dismissed with prejudice.

Second, Plaintiff claims that he was unable to effectively communicate with his criminal defense attorneys without being monitored.  (Tr. 34-35).  In the early days of the COVID-19 pandemic, and right before Plaintiff's criminal trial was scheduled, he complains that his attorneys were not allowed to visit; that JCADC lacked videoconferencing capability; and that all communication with his attorneys was conducted on recorded telephone lines.  *Id*.  The County Defendants argue that

this claim is abandoned because Plaintiff failed to address it in response to their dispositive Motion. Reb. [119] at 2. Regardless, this claim also fails on the merits.

It is not immediately clear which cause of action Plaintiff intends to pursue on these facts. If Plaintiff claims that these circumstances hindered his access to the courts, he must demonstrate an actual injury. *See Bush v. Ladner*, No. 3:11-cv-00152-LRA, 2013 WL 5117707, at *2 (S.D. Miss. Sept. 12, 2013). That is, "[a] prisoner must show actual prejudice with respect to contemplated or existing litigation, such as the inability to meet a filing deadline or to present a claim." *See id.* (quotation omitted). But Plaintiff has failed to allege an actual injury; he testified that the situation was eventually "rectified," and his trial date was ultimately postponed because of the COVID-19 pandemic anyway. (Tr. 34-35). If Plaintiff claims a violation of the attorney-client privilege, those claims are not cognizable under § 1983. *See Buffington v. Valdez*, No. 3-07-CV-260-P, 2007 WL 2719885, at *5 (N.D. Tex. Sept. 18, 2007) (quoting *Bradt v. Smith*, 634 F.2d 796, 800 (5th Cir. 1981)). If Plaintiff claims a violation of his Sixth Amendment right to effective counsel, he has not alleged that he was *unable* to communicate with his attorneys—only that he could not do so how he pleased. *See id.* (noting that "nothing preventing [the plaintiff] from using the mails to communicate with his attorney"). And, if Plaintiff claims a violation of his Fourth Amendment right to privacy, he cannot claim a reasonable expectation of privacy in calls made on a telephone line that he *knew* was recorded. *See Carley v. Temple*, No. 11-682-JJB-SCR, 2012 WL 3233596, at *2 (M.D. La. July

2, 2012) (collecting cases).  This claim should be dismissed with prejudice.

### c. *Use of Dirty Hair Clippers*

Plaintiff also claims that JCADC personnel do not disinfect the hair clippers between inmate uses.  (Tr. 25).  As a result, Plaintiff says that he contracted folliculitis on his neck, which was treated with a steroid cream.  (Tr. 26).  Plaintiff blames this condition on "Deputy Pinter," *id*., though he never amended his Complaint to name that person as a Defendant.

Nonetheless, Captain Nelson testified that "inmates [are] not required to cut their hair unless they [are] assigned to certain jobs within the jail, or if it was deemed medically necessary, neither of which applied to Mr. Scott."  Mot. [107-1] at 3. Further, "the clippers were provided for the convenience of the inmates, who typically cut their own or each other's hair."  *Id*.  "No inmates or employees of [JCADC] were assigned to be barbers."  *Id*.  And Plaintiff does not dispute this account.  "[T]he Eighth Amendment does not address injury caused by an inmate's voluntary acts." *Legate v. Livingston*, 822 F.3d 207, 211 (5th Cir. 2016) (rejecting Eighth Amendment claim of plaintiff who voluntarily participated in religious pipe-smoking ceremony and subsequently contracted Hepatitis C).  Insofar as Plaintiff was not required to cut his hair, but chose to do so, this claim fails.

There is a potential factual dispute on whether a cleaning solution was ever provided to disinfect the clippers.  Captain Nelson testified by affidavit that he placed "a can of Barbicide clipper cleaning spray in the control room and advis[ed] Mr. Scott

to request it when he needed to clean the clippers." Mot. [107-1] at 3. To the contrary, Inmate Hendricks testified by affidavit that he and other inmates "asked for cleaner to clean the clippers but none was provided." Mot. [115-1] at 1. In any event, this factual dispute is not *material* because Plaintiff voluntarily chose to have his hair cut—despite not being required to do so. Moreover, the undersigned finds that Plaintiff's folliculitis, which eventually "reced[ed]" after treatment with a steroid cream (Tr. 26), is a *de minimis* injury that fails to state a constitutional claim, *see Presley v. Sanders*, No. 1:14-cv-00130-MTP, 2016 WL 6651375, at *4 (S.D. Miss. Nov. 10, 2016) (holding that a "minor skin condition . . . does not rise to the level of a constitutional concern"). This claim should be dismissed with prejudice.

### d. Overuse and Misuse of Lighting

Finally, Plaintiff complains that the overhead lights at JCADC were left on for a period of many months before being manually shut off, causing him to "be irritable and sleep deprived." Am. Compl. [7] at 23; (Tr. 32). To prevail on a claim like this, Plaintiff must "demonstrate that a prison official has violated the Eighth Amendment." *Phillips v. Williams*, No. 4:18-cv-00014-JMV, 2019 WL 2016858, at *4 (N.D. Miss. May 7, 2019). In doing so, he must prove a "sufficiently serious" deprivation and that "the prison official . . . ha[d] a sufficiently culpable state of mind." *Id.* In other words, he must show "that his deprivation [was] unnecessary and wanton." *Chavarria v. Stacks*, 102 F. App'x 433, 436 (5th Cir. 2004).

The Fifth Circuit Court of Appeals has previously decided that a "policy of 24-

41

hour illumination does not violate the Eighth Amendment." *Id*. at 437. But JCADC has no such policy; instead, "the continuous bright lighting was not intentional." *See Phillips*, 2019 WL 2016858, at *4. Jeffery Kyle Lyon, who is employed by JCADC in Information Systems, testified by affidavit that he became aware in November 2020 that the lights in the facility were "not dimming at night as they usually did." Mot. [107-4] at 1. He determined that a faulty part in the lighting system was to blame, and he was advised by the part distributer that a replacement was not immediately available. *Id*. Eventually, Lyon learned that the manufacturer had "discontinued the part requested," but ultimately uncovered a workaround and "reprogrammed the system" accordingly. *Id*. at 1-2. Plaintiff does not dispute this account of events. Instead, he insists that the lights should have been manually turned off or that the inmates should have been relocated "to [an] area where lighting was not a problem." Resp. [116] at 12.

The existence of alternative scenarios does not establish "that the defendants had a culpable state of mind regarding the continuous lighting." *See Phillips*, 2019 WL 2016858, at *4. Instead, uncontested evidence shows that the continuous lighting was unintentional, was not maintained pursuant to JCADC policy, and was remedied as soon as possible. Mot. [107-4] at 1-2. Finally, Plaintiff neglects to mention the obvious solution to his quandary: "A little cloth over his eyes would solve the problem, negate [sleep] deprivation, and escape this exercise in frivolity." *See Chavarria*, 102 F. App'x at 437 (Reavley, J., specially concurring) (calling the claim about continuous

illumination "much ado about nothing"). This claim does not rise to the level of a constitutional violation, and it should be dismissed with prejudice.

### C. Plaintiff's Motion [130] to Dismiss CT Corporation Systems

At the Omnibus Hearing, Plaintiff testified that he sued CT Corporation Systems because he "was told that [it] was a parent company or possibl[e] insurer of Vital Core." (Tr. 27). He further testified that he "got a letter from [CT Corporation Systems] saying they were" served (Tr. 37), though no proof of service appears on the Court's docket. On July 19, 2022, the Court ordered Plaintiff "to file proof of service or a Waiver of Service for CT Corporation Systems" on or before August 19, 2022. Order [44] at 2. Plaintiff did not timely comply.

On June 23, 2023, the Court ordered Plaintiff to "explain why CT Corporation Systems should not be dismissed as Defendant for his failure to perfect service of process in compliance with the Court's Order [44]." Order [126] at 2. In response, Plaintiff moved to dismiss CT Corporation Systems as Defendant herein. Mot. [130] at 1. Insofar as Plaintiff has "failed to timely perfect service of process," CT Corporation Systems should be dismissed without prejudice as Defendant under Federal Rule of Civil Procedure 4(m). *See*, *e.g.*, *Pride v. Meaut*, No. 1:22-cv-00220-TBM-BWR, 2023 WL 4141674, at *2 (S.D. Miss. Feb. 6, 2023), *report and recommendation adopted by* 2023 WL 4142013, at *1 (S.D. Miss. June 22, 2023). That is, his Motion [130] to Dismiss CT Corporation Systems should be granted.

**D. Plaintiff's Motion [131] for Reconsideration**

Plaintiff insists that the Court should not grant summary judgment because he "has not had [an] opportunity to pursue [d]iscovery," and his "[d]iscovery requests have not been answered."  Resp. [116] at 4; Resp. [121] at 4.  Accordingly, he asks the Court to reconsider its earlier Order [125] granting the County Defendants' Motion [106] to Strike Notice of Service of Request for Production of Documents and denying his Motion [110] to Compel Production of Documents with Sanctions.  But Plaintiff has enjoyed ample opportunity—including multiple extensions of the discovery deadline—to pursue discovery in this lawsuit.  His failure to do so (or failure to do so properly) is no reason to delay the final resolution of this case.

The following timeline of the discovery process in this case is illustrative.  On November 7, 2022, the Court established a discovery deadline of December 7, 2022, and a dispositive-motions deadline of December 28, 2022.  Order [62] at 8.  On November 23, 2022, Plaintiff moved the Court to issue subpoenas to JCADC and Vital Core Health Strategies, seeking the production of fourteen categories of documents and evidence.  Mot. [66] at 3.  On December 5, 2022, the Court denied his request without prejudice, instructing Plaintiff instead to propound discovery requests to those party opponents under Federal Rules of Civil Procedure 34 and 36.  Order [69] at 1-2.  To accommodate his effort, the Court extended the discovery deadline to February 7, 2023, and the dispositive-motions deadline to February 28, 2023.  *Id.* at 2.

44

Within the established discovery window, Plaintiff again moved the Court to issue subpoenas to JCADC and to several non-parties. Mots. [72] [73] [74] [75] [76]. Four days later, the Court denied these motions "without prejudice to [Plaintiff's] ability to obtain subpoenas from the Clerk of Court and have them properly served before the discovery period expires." Order [77] at 1. The Clerk of Court issued two subpoenas to JCADC on January 31, 2023, about a week before the discovery deadline.[5] Subpoenas Issued [80]. Those subpoenas were subsequently quashed because JCADC is effectively a party to this lawsuit, and "[s]ubpoenas under Rule 45 are clearly not meant to provide an end-run around the regular discovery process under Rules 26 and 34." Order [98] at 5 (quoting *Burns v. Bank of Am.*, No. 03-cv-1685-RMB-JCF, 2007 WL 1589437, at *14 (S.D.N.Y. June 4, 2007)). To this point in time, Plaintiff had propounded interrogatories, *see* Notice [65], but had not propounded any discovery requests to his opponents under Rules 34 or 36—which the Court advised him to do more than three months earlier.

On February 6, 2023, one day before the discovery deadline, the Vital Core Defendants moved the Court to compel Plaintiff to execute and return a HIPAA authorization. Mot. [83] at 1-2. According to the Vital Core Defendants, they had requested the authorization be signed as early as December 6, 2022, and twice again on December 20, 2022, and January 24, 2023. *Id.* Still, Plaintiff did not comply. *Id.* at 2. The Court promptly ordered Plaintiff "to provide Defendants with the signed

---

[5] Subpoenas were issued and returned executed with respect to Plaquemines Parish Detention Center, Escambia County Jail, and Muskogee County Jail. Subpoenas Returned [86] [87] [88].

HIPAA medical authorization form within 14 days."  Order [84] at 2.

Accordingly, the Court established a final discovery deadline of April 10, 2023, and a final dispositive-motions deadline of May 1, 2023.  Order [84] at 3.  The parties were warned that "the Court [would] not grant any more extensions of the discovery period absent a showing of good cause."  *Id*. at 2.  The parties were also "reminded 'that discovery requests must be propounded sufficiently in advance of the discovery deadline so that all responses will be due . . . by the discovery deadline.'"  *Id*. (citing *Hughes v. Boston Scientific Corp.*, No. 2:08-cv-00079-KS-MTP, 2009 WL 3031680, at *1 (S.D. Miss. Sept. 17, 2009)).  This extension afforded Plaintiff sixty *more* days to propound the discovery requests that he was instructed to propound in early December 2022.  *See* Order [69] at 1-2.

Finally, Plaintiff filed a Notice [102] of Service of Request for Production on March 21, 2023.  Plaintiff dated his Notice [102] of Service of Request for Production of Documents on March 10, 2023, but the requests themselves were dated March 20, 2023.  Mot. [106-1] at 1-3.  Moreover, the envelope bearing the requests was addressed to the Jackson County Board of Supervisors and postmarked March 20, 2023, *see* Mot. [106-2] at 1—a mere three weeks before the discovery period was set to expire.  Plaintiff admits that he "only . . . provided twenty days before the expiration date for [d]iscovery," but argues that "Defendants could have filed [a] Motion for Extension of Time to Comply."  Resp. [123] at 2.  Worse, the Vital Core Defendants received Plaintiff's requests by mail on April 21, 2023—almost two weeks *after* the discovery

period expired.  Joinder [109] at 1.

Then, the County Defendants and the Vital Core Defendants jointly asked that Plaintiff's Notice [102] of Service Request for Production of Documents signed on March 10, 2023, be stricken as untimely.  Mot. [106]; Joinder [109].  Conversely, Plaintiff asked the Court to compel Defendants to produce the requested documents. Mot. [110] at 1-3.  He also asked the Court to impose sanctions in the amount of $400.00—representing the cost of "service of process, postage, copies and time needlessly . . . inflicted on Plaintiff by not simply producing [the] documents." *Id.* at 3.  The Court granted the Motion [106] to Strike Notice of Service of Request for Production of Documents and denied the Motion [110] to Compel Production of Documents and for Sanctions, "reject[ing] Plaintiff's attempt to control discovery on his timetable."  Order [125] at 7.

Plaintiff now asks the Court to reconsider its ruling for four main reasons. *First*, Plaintiff says that he was "moved to five different facilities in the months of October, November, and up to the middle of December 2022."  Mot. [121] at 1. *Second*, Plaintiff suggests the Court gave him conflicting instruction by "advising [him] to issue [s]ubpoenas to Defendants . . . [and] then denying that method to [him]." *Id.* at 2. *Third*, admitting that his discovery requests were propounded untimely, Plaintiff insists that Defendants had plenty of time to respond anyway.  *Id.* at 4.  *Fourth*, Plaintiff asks the Court to excuse his dilatory conduct because he cannot control the prison mail system.  *Id.*  None of these excuses justify prolonging the resolution of

this case.

Even if Plaintiff was relocated several times through mid-December 2022, the discovery deadline was finally extended to April 10, 2023. Order [84] at 3. Plaintiff offers no reason the discovery requests that he ultimately propounded could not have been mailed two weeks earlier to render them timely under the operative scheduling order. Nor should the Court reward his dilatory behavior by holding Defendants to a truncated responsive timeline of Plaintiff's design. Moreover, it was Plaintiff's choice to route his mail through his mother's address—forcing an additional waiting period before he received correspondence from the Court. *See* Mot. [131] at 4.

Finally, the undersigned is not Plaintiff's attorney and is under no obligation to provide him with legal advice on how to conduct discovery. Nonetheless, none of the instruction provided to Plaintiff in the Court's discovery orders has been contradictory. Plaintiff was ordered to use discovery mechanisms in Federal Rules of Civil Procedure 26 and 34 to solicit information from party opponents. Order [69] at 1-2. To the contrary, he was ordered to subpoena information from non-parties and given explicit instruction on how to do so through the Clerk of Court. Order [77] at 1. "Despite the Court's willingness to provide assistance to pro se litigants, this posture does not constitute a license for a plaintiff filing pro se to ignore the Federal Rules of Civil Procedure." *See Rabeneck v. COX Enters.*, No. 20-3006, 2021 WL 6123051, at *3 (E.D. La. July 21, 2021) (quotation omitted); *see also Thrasher v. City of Amarillo*, 709 F.3d 509, 512 (5th Cir. 2013) ("A litigant's pro se status [does not

48

excuse] . . . him for lack of knowledge of the Rules of Civil Procedure."). Plaintiff has offered no viable reason for the Court to reverse its discovery ruling [125], and the undersigned recommends that Plaintiff's Motion [131] for Reconsideration be denied.

## IV. RECOMMENDATION

The Motion [107] for Summary Judgment filed by the County Defendants should be granted, the Motion [112] for Summary Judgment filed by the Vital Core Defendants should be granted, the Motion [130] to Dismiss CT Corporation Systems filed by Plaintiff should be granted, and the Motion [131] for Reconsideration filed by Plaintiff should be denied. Accordingly, Plaintiff Jacob Blair Scott's claims against Sheriff Mike Ezell, Captain Tyrone Nelson, Deputy Geneva Drummond, and John Barnes should be dismissed with prejudice. His federal claims against Vital Core Strategies, Amanda Harris, and Angie Hand should be dismissed with prejudice, and his state-law claims against these Defendants should be dismissed without prejudice. Plaintiff's claims against CT Corporation Systems should also be dismissed without prejudice. Recommending dismissal of all claims, the undersigned finally recommends that this case be closed.

## V. NOTICE OF RIGHT TO APPEAL/OBJECT

Within fourteen days of being served with a copy of this Report and Recommendation, any party may serve and file written objections with the Clerk of Court. An objecting party must specifically identify the findings, conclusions, and recommendations to which he objects. Within seven days of service of the objections,

49

the opposing party must either serve and file a response or notify the District Judge that he does not intend to respond to the objections.  L. U. Civ. R. 72(a)(3).

The District Judge shall make a *de novo* determination of those portions of the Report and Recommendation to which objection is made.  The District Judge may accept, reject, or modify, in whole or in part, the findings or recommendations made by the Magistrate Judge.  The District Judge may also receive further evidence or recommit the matter to the Magistrate Judge with instructions.  *See* 28 U.S.C. § 636(b)(1).

The District Judge need not consider frivolous, conclusive, or general objections.  A party who fails to file written objections to the proposed findings, conclusions, and recommendations of the Magistrate Judge shall be barred, except upon grounds of plain error, from attacking on appeal any proposed factual finding or legal conclusion adopted by the Court to which he did not object.  *See Wallace v. Miss.*, 43 F.4th 482, 494-95 (5th Cir. 2022) (collecting cases).

**SIGNED,** this 18th day of July, 2023.

*s/ Bradley W. Rath*
BRADLEY W. RATH
UNITED STATES MAGISTRATE JUDGE